## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JOSEPH R. WILLIAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:22-cv-439-AMM** |
| | ) | |
| **CITY OF BIRMINGHAM, d/b/a** | ) | |
| **BIRMINGHAM FIRE AND** | ) | |
| **RESCUE SERVICE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on a motion for summary judgment by the defendant, City of Birmingham ("the City") doing business as Birmingham Fire and Rescue Service ("BFRS"). Doc. 31. For the reasons explained below, the motion is **GRANTED**.

## I.    BACKGROUND

Facts set forth in the parties' statement of material undisputed facts are deemed admitted for summary judgment purposes unless controverted by the response or reply of the opposing party. These are the undisputed material facts construed in the light most favorable to plaintiff Joseph R. Williams, and those disputed by the City but construed against it for purposes of its summary judgment motion:

## A.    The Promotion Process

This case is about the 2020 BFRS promotion process. The promotion process began with a mandatory orientation. Doc. 33-1 at 54. Orientation sessions were scheduled to occur on June 16 and 17. *Id.* And due to "COVID-19 social distancing guidelines, the orientation [was] conducted virtually through Cisco Webex." *Id.* According to Tina Moorer, the Human Resources ("HR") Project Coordinator, no makeup orientation sessions would be held. *Id.*

Following the orientation, candidates eligible for promotion could take part in a three-phase process. Doc. 33-2 at 51–54. In Phase I, candidates were asked to complete a work sample exercise. *See id.* at 51. The candidates used an identification number instead of their names so that Phase I would be graded blindly. *See* Doc. 34-1 at 5–6. For Phase II, candidates were asked to submit their Personal Accomplishment Workbook ("PAW"). Doc. 33-2 at 52. The PAW contains the candidate's work history, educational history, certifications, personal and professional development, commendations, awards, corrective actions, and attendance. *Id.* at 52–53. The PAWs were "scored by [BFRS] leadership, with oversight from Human Resources to ensure consistency across all candidates." *Id.* at 53.

Candidates were required to submit three bound copies of the PAW by noon on Wednesday, July 1, 2020. *Id.* at 52. On or before June 26, 2020, candidates

2

received "a conflict form with a list of panelists scoring the PAWs." *Id.* at 53. Each candidate was required to say whether he or she had "a personal or familial relationship with any of the panelists." *Id.* Additionally, each candidate had "the opportunity to strike the name of one . . . panelist" from his or her scoring panel. *Id.* The striking information was confidential. *Id.* Candidates were required to turn in the conflict forms by email to Ms. Moorer by 3:00 p.m. on July 1, 2020. Doc. 33-1 at 19, Dep 71:7–13; Doc. 33-3 at 37.

After Phase II, candidates were notified of their scores and rank by email. Doc. 33-2 at 57. The parties disagree as to who advanced to Phase III. According to the City, the top fifty-two candidates advanced to Phase III. Doc. 33-3 at 10, Dep. 30:6–15. According to Mr. Williams, the top fifty-four candidates advanced to Phase III. Doc. 33-1 at 30, Dep. 114:17–115:10. Phase III included a structured interview scored by a panel. Doc. 33-2 at 53–54.

The Promotion Information Guide for Candidates (the "Guide") set certain expectations for candidates to follow throughout the promotion process. *See* Doc. 33-1 at 56–79. For instance, candidates were required to "wear seasonal Class B uniforms for both Phase 1 and Phase 3 of the promotional process." *Id.* at 70. Candidates were warned that those "not dressed in the required attire will be subject to disqualification from the selection process." *Id.* (cleaned up). The Guide also informed candidates that "[n]o make-up phases will be given during this process"

3

with the sole exception for candidates "who are on active military duty on the day of the exam." *Id.* at 71. The Guide additionally stated that "[f]ailure to submit requested documentation by assigned deadlines will result in a deduction of 5 points from the overall score." *Id.* at 74.

**B.    The Summer 2020 Promotion Process**

Mr. Williams was eligible to participate in the 2020 BFRS promotion process. Doc. 34-1 at 23. On June 11, 2020, Ms. Moorer sent an email to Mr. Williams with the Guide and his assigned orientation session. Doc. 33-1 at 80; *id.* at 10, Dep. 35:13–36:16. Because BFRS was conducting the orientation over Cisco Webex, the email contained a link where candidates could test their ability to join the meeting. *Id.* at 80.

Mr. Williams successfully attended his assigned orientation session on June 17 at 10 a.m. *See* Doc. 34-2 at 19. According to the City, twelve candidates had connection issues that caused them to be late or absent from their assigned orientation sessions. *See* Doc. 34-1 at 11–14. Ten of these candidates were African–American, and two were white. *See id.* at 21–26. The City offered candidates who experienced connection issues the opportunity to attend the next available orientation session. *See id.* at 11–14. The City also offered two additional orientation sessions due to the connection issues. *Id.* at 5, 9.

On June 19, Mr. Williams emailed the City's HR Special Projects team email address about the orientation session. Doc. 34-2 at 19. In that email, Mr. Williams stated that "a few candidates show[ed] up late, two over 20 minutes late." *Id.* He said that "[w]e were all given the opportunity to log on a week in advance to ensure there were no problems getting connected." *Id.* He asked for clarification as to "how someone that is late for a meeting that has no makeups is counted present just as one that was early[.]" *Id.* HR Special Projects replied to Mr. Williams's email a few days later, stating that his "question has been received and it is under review." *Id.*

On June 26, Mr. Williams received an email from Ms. Moorer informing him that Phase I would take place on June 30. Doc. 34-1 at 18. That email also informed Mr. Williams that his conflict form was due via email by 3:00 p.m. on July 1. *Id.* The email included the conflict form as an attachment. *Id.* Mr. Williams "denie[s]/dispute[s]" this fact "as to the citation," but cites no further basis for his disagreement. *See* Doc. 38 at 7.

On June 30, Mr. Williams completed Phase I. *See* Doc. 33-2 at 103–08. For Phase II, Mr. Williams turned in his PAW on time and did not receive any deduction in points related to the timeliness of his PAW. Doc. 33-3 at 15, Dep. 49:14–19. Mr. Williams received a phone call on July 6 informing him that the City had not received his PAW, Doc. 33-1 at 26, Dep 99:3–12, but he received a call later that same day informing him that his PAW had been found, *id.* at 27, Dep. 103:20–104:1.

5

On July 6, Ms. Moorer sent Mr. Williams an email informing him that he "did not meet the July 1st deadline to return the Candidate Conflict Form." Doc. 33-3 at 38. Mr. Moorer told Mr. Williams that he needed "to return the attached [conflict] form by 3:00 pm today, July 6, 2020." *Id.* Additionally, because the "deadline ha[d] passed," Ms. Moorer told Mr. Williams that he would "receive a 5 [point] deduction from [his] overall score." *Id.*

Mr. Williams disputes this fact, and states that he "sent his candidate conflict form to Tina Moorer's correct email address, on July 1, 2020, at 11:10 a.m." Doc. 38 at 8; Doc. 33-1 at 22, Dep. 82:9–23. Mr. Williams also states that he sent another email to Ms. Moorer "at 11:34 a.m. on July 1, 2020" from a different email address, but he "misspelled [Ms.] Moorer's name in the address line." Doc. 38 at 8; Doc. 33-1 at 22, Dep. 82:17–84:13.

According to the City, Mr. "Williams provided emails on July 10 . . . and July 16 . . . purporting to show that he had timely submitted his Conflict Form to [Ms.] Moorer on July 1." Doc. 32 at 12; Doc. 33-1 at 120–21; *see id.* at 21–22, Dep. 78:19–82:23. Because Mr. Williams asserted that he submitted the conflict form before the deadline, "the City performed an investigation." Doc. 32 at 12; *see* Doc. 33-4 at 11, Dep. 34:8–35:9. Ms. Moorer never found an email from Mr. Williams on July 1, Doc. 33-3 at 8, Dep. 22:17–19, and Mr. Russom, a network system administrator with "[t]he City's Information Management Services Department . . . performed a

search of the City's email system . . . [which] showed that no emails were received by [Ms.] Moorer from any of the four email addresses provided by [Mr.] Williams (or from any other email address)," Doc. 32 at 12; Doc. 33-4 at 10, Dep. 31:2–10; Doc. 33-4 at 4, Dep. 8:21–22. Because the City determined that Mr. Williams failed to submit the conflict form before the deadline, it deducted five points from his overall score. Doc. 33-1 at 29, Dep. 111:20–112:2.

Mr. Williams disputes the City's findings and maintains that he submitted the conflict form on July 1 before the 3:00 p.m. deadline. Doc. 38 at 8–9; Doc. 33-1 at 22, Dep. 82:9–23. Mr. Williams asserts that Ms. "Moorer chose to overlook the fact that [he] sent his candidate conflict form . . . before the . . . deadline." Doc. 38 at 8; Doc. 33-1 at 44, Dep. 169:20–171:9. According to Mr. Williams, Ms. Moorer "falsified a document" because "[s]he never turned in the documents that caused my five-point deduction." Doc. 33-1 at 44, Dep. 169:22–170:1. Mr. Williams says that Ms. Moorer took these actions "despite her email inbox clearly showing [the conflict form] was received on Wednesday 7/1/2020 at 11:10 a.m." Doc. 38 at 9 (cleaned up); Doc. 33-3 at 20, Dep. 71:10–72:11; Doc. 37-2 at 2–6.

According to the City, Mr. "Williams was one of eight candidates who failed [to timely] submit the conflict form." Doc. 32 at 12 (cleaned up); Doc. 34-1 at 26. "Of the eight candidates, five . . . were Caucasian and three . . . were African American." Doc. 32 at 12; Doc. 34-1 at 26. Three of those eight candidates, all white

7

men who received five-point deductions for failing to turn in their conflict form on time, were invited to participate in Phase III and were eventually promoted. Doc. 34-1 at 25–26.

Mr. Williams alleges that some African–American applicants "either showed up late to . . . orientation," were not wearing the correct uniform, "or both, and still got the promotion to Lieutenant." Doc. 38 at 3–4; Doc. 33-1 at 41, Dep. 160:7–22. According to Mr. Williams, none of these applicants suffered a points deduction. Doc. 38 at 4; Doc. 33-1 at 42, Dep. 161:6–22. The City says that these comparisons are irrelevant because "no candidate, no matter their race . . . was deducted points or disqualified for being late to Orientation due to technology/connection issues." Doc. 32 at 17; Doc. 34-1 at 4, 16. Similarly, the City contends that "there is no evidence that the City disqualified any candidate, Caucasian, African American or other, who participated in the 2020 promotion process as a result of failing to wear required attire." Doc. 32 at 19; Doc. 34-1 at 16.

Mr. "Williams did not qualify to advance to Phase III of the promotion process," Doc. 32 at 13; Doc. 33-1 at 50, Dep. 194:13–15, and therefore he was not promoted.

### C.    Additional Relevant Facts

Mr. Williams alleges that "[t]he City create[d] a spreadsheet of the fire promotional candidates['] demographics that it use[d] when considering promotions

8

because it wanted to be equally balanced between race, sex and age." Doc. 38 at 9. He cites the deposition of Jill Madajczyk—the Chief Organizational Compliance Officer for the City, Doc. 33-2 at 5, Dep. 11:10–14—in which she testified that "a spreadsheet . . . was created for the 2020 fire lieutenant candidate promotional process with demographics," *id.* at 25, Dep. 91:1–4. Ms. Madajczyk stated that it was important for the City "to keep the demographics of the candidates . . . [b]ecause [the City] want[ed] to make sure that there is no adverse impact in [its] promotional processes." *Id.*, Dep. 91:8–14. Specifically, Ms. Madajczyk explained that "adverse impact" meant "[t]hat somehow our process is unfair to individuals of color, gender, sexual orientation. It's mostly . . . for females and African Americans. Although we do have to look at Hispanics because we do have Hispanics . . . in the Fire Department." *Id.*, Dep. 91:15–22.

Mr. Williams also alleges that in 2021, the BFRS completely overhauled its promotion process. *See* Doc. 38 at 12–14. These changes included: (1) allowing more leeway to make-up components of the process, *see* Doc. 33-2 at 21, Dep. 74:7–76:17; (2) requiring that PAWs be submitted electronically to HR instead of hand-delivery, Doc. 33-3 at 8, Dep. 23:13–24:13; (3) removing the mandatory Class B seasonal uniform requirement for Phases I and III, Doc. 33-2 at 22, Dep. 77:14–22; (4) sending conflict forms to HR instead of to Ms. Moorer, *id.*, Dep. 79:7–18; and (5) allowing a grace period for tardiness, *id.*, Dep. 80:8–20.

The City does not dispute the changes, but it does dispute their timing. *See* Doc. 39 at 12. According to the City, "[t]he changes to the promotion process . . . was an overhaul that occurred going **into** the 2020 promotion process, not after the 2020 and before the 2021 promotion process." *Id.*; Doc. 33-2 at 20–21, Dep. 72:5–73:13.

Mr. Williams alleges that six months after he filed this lawsuit, "he received a private email from [Ms.] Madajczyk[] that there was an opening for fire lieutenant promotions and he was eligible to take the testing for Phase [II]." Doc. 38 at 17–18; Doc. 33-1 at 34, Dep. 129:16–130:19. When Mr. "Williams contacted the [Jefferson County] personnel board and informed them of his current lawsuit, the personnel board told [him] that he was not on the list of names given to the City . . . for promotions." Doc. 38 at 18; Doc. 33-1 at 47–48, Dep. 184:17–185:7.

Mr. Williams states that he later retested in 2021 and "went from a Rank of 62 to a Rank of 1." Doc. 38 at 18; Doc. 33-1 at 37, Dep. 142:1–143:3; Doc. 33-3 at 10, Dep. 31:17–19. Mr. Williams says that when Chief Moon—the Chief of BFRS— called to tell him he had been promoted, Chief Moon said, "I just want to let you know that you have been promoted, I'm sorry HR f[*****] you last time but I'm glad they got it right." Doc. 38 at 19; Doc. 33-1 at 49, Dep. 190:11–191:8.

Mr. Williams filed this lawsuit in April 2022. Doc. 1. In December 2023, the City moved for summary judgment. Doc. 31. That motion is fully briefed. Docs. 32,

38, 39. In Mr. Williams's response, he asks the court to strike two exhibits "that were not produced in discovery." Doc. 38 at 6.

## II.     LEGAL STANDARD

A party moving for summary judgment must establish "that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could "affect the outcome" of the case. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (cleaned up). A material fact is in "genuine" dispute if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. (cleaned up). In deciding a motion for summary judgment, the court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (cleaned up).

## III.    ANALYSIS

### A.     Mr. Williams's Race Discrimination Claims for Failure To Promote (Counts I and II)

Mr. Williams brings claims of racial discrimination against the City under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. "Title VII of the

Civil Rights Act of 1964 outlaws employment discrimination because of 'race, color, religion, sex, or national origin.'" *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 943 (11th Cir. 2023) (quoting 42 U.S.C. § 2000e-2(a)(1)). "Likewise, 42 U.S.C. § 1981 prohibits employers from intentionally discriminating on the basis of race in employment contracts." *Id.* at 944. "To prove a claim under either statute, a plaintiff can use direct evidence, circumstantial evidence, or both." *Id.*

"Discrimination claims brought under Title VII may be pursued under a 'single-motive' theory—in which the employee alleges that unlawful bias was 'the true reason' for an adverse employment action . . . ." *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1321 (11th Cir. 2023) (quoting *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016)). Or a plaintiff may employ "a 'mixed-motive' theory—in which she alleges that bias was simply '*a* motivating factor' for the adverse action, 'even though other factors also motivated the practice.'" *Id.* (quoting 42 U.S.C. § 2000e-2(m)). "Section 1981 claims brought alongside Title VII claims may be pursued under the single-motive theory only." *Id.*

"In order to survive summary judgment, a plaintiff alleging intentional discrimination [under Title VII] must present sufficient facts to permit a jury to rule in her favor." *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019). "One way that she can do so is by satisfying the burden-shifting framework set out in *McDonnell Douglas*" for single-motive cases. *Id*. "A plaintiff can also present

direct evidence of discriminatory intent, . . . or demonstrate a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination . . . ." *Id.* at 1220 n.6. Additionally, a plaintiff "employee can succeed on a mixed-motive claim [under Title VII] by showing that illegal bias, such as bias based on sex or gender, 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." *Quigg*, 814 F.3d at 1235 (quoting 42 U.S.C. § 2000e-2(m)).

### 1.    Mr. Williams's Claims Do Not Survive Summary Judgment Under the McDonnell Douglas Framework

To establish a *prima facie* case of discrimination under *McDonnell Douglas*, a plaintiff must show "(1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis*, 918 F.3d at 1220–21. The plaintiff may also satisfy the fourth element by demonstrating that "he was replaced by a person outside his protected class." *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003).

"A plaintiff asserting an intentional-discrimination claim under *McDonnell Douglas* must demonstrate that she and her proffered comparators were similarly situated in all material respects." *Phillips*, 87 F.4th at 1322 (cleaned up). A similarly-

situated comparator generally "will (1) have engaged in the same basic conduct as the plaintiff; (2) have been subject to the same employment policy, guideline, or rule as the plaintiff; (3) have been under the jurisdiction of the same supervisor as the plaintiff; and (4) share the plaintiff's employment or disciplinary history." *Id.*

"If the plaintiff succeeds in making out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Lewis*, 918 F.3d at 1221. "The defendant need not persuade the court that it was actually motivated by the proffered reason, but need only present evidence raising a genuine issue of fact as to whether it discriminated against the plaintiff." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010).

"Finally, should the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that merges with the plaintiff's ultimate burden of persuading the factfinder that she has been the victim of intentional discrimination." *Lewis*, 918 F.3d at 1221 (cleaned up). "To show pretext, [Mr. Williams] must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Alvarez*, 610 F.3d at 1265 (quoting *Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir. 1997)).

The plaintiff cannot "recast an employer's proffered nondiscriminatory

14

reasons or substitute [her] business judgment for that of the employer." *Id.* (quoting *Chapman v. AI Transp.,* 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc)). So long as the employer proffers a reason "that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason." *Id.* at 1265–66 (quoting *Chapman*, 229 F.3d at 1030).

According to the City, Mr. Williams cannot succeed under the *McDonnell Douglas* framework "because he cannot establish other similarly situated candidates were treated more favorably." Doc. 32 at 15. Although Mr. Williams identified six co-workers as alleged potential comparators in his deposition, *see* Doc. 33-1 at 43, Dep. 165:18–166:2, on summary judgment he disclaims reliance on comparators and says that the "comparator analysis is not necessary," Doc. 38 at 21. Because Mr. Williams does not rely on comparator analysis and contends that the court need not perform a comparator analysis, he cannot rely on the *McDonnell Douglas* framework to survive the City's motion.

**2.    Mr. Williams's Claims Do Not Survive Summary Judgment Under the Convincing Mosaic Metaphor**

"[A] 'convincing mosaic' is a metaphor, not a legal test and not a framework." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311 (11th Cir. 2023). "A 'convincing mosaic' of circumstantial evidence is simply enough evidence for a

reasonable factfinder to infer intentional discrimination in an employment action—the ultimate inquiry in a discrimination lawsuit." *Tynes*, 88 F.4th at 946.

"[A] plaintiff may establish a convincing mosaic with evidence of (1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) systematically better treatment of similarly-situated employees; and (3) that the employer's justification is pretextual." *Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1337 (11th Cir. 2024) (cleaned up). "Employees are not limited in the kinds of circumstantial evidence they may present." *Berry*, 84 F.4th at 1311.

The City argues that all candidates were treated equally. "[N]o candidate, no matter their race or their assigned Orientation session, was deducted points or disqualified for being late to Orientation due to technology/connection issues." Doc. 32 at 17. Further, "[a]ll candidates, including those who were tardy or missed their assigned Orientation session entirely for technology/connection and/or personal issues were afforded the opportunity to join a later session on June 16 or 17." *Id.* And "all candidates who had difficulty attending any of the June 16 or 17 Orientation sessions were afforded a new opportunity for Orientation on June 29." *Id.* In addition, "the dress requirement was applied equally to all candidates regardless of race." *Id.* at 19. Mr. Williams and the other seven candidates who failed to "submit the Conflict Form on time were given a five-point deduction." *Id.* at 18. The City

16

points out that five of those candidates "were Caucasian and three were African American." *Id.*

The City contends that its "reason for not promoting [Mr. Williams] was legitimate and non-discriminatory." *Id.* at 15. Namely, the City did not promote Mr. Williams "because he did not rank high enough after Phase I and Phase II of the promotion process to continue to advance to Phase III." *Id.* The City says this explanation for its decision is "honest, legitimate, and nondiscriminatory." *Id.* at 21.

Mr. Williams responds that "arbitrary decisions by the City led to his denial of promotion based on race." Doc. 38 at 22 (cleaned up). According to Mr. Williams, "African-Americans were given preferential treatment for breaking mandatory promotional rules." *Id.* at 23. Mr. Williams contends that "[t]he City made exceptions to the[] . . . rules *after* candidates were either tardy or absent to orientation, late in turning in their PAWs, and did not wear the appropriate attire to interviews." *Id.* at 24. By contrast, Mr. Williams says that he "was not extended the same courtesy" even "after the July 1, 2020 email" containing his conflict form "was discovered." *Id.* at 25. Mr. Williams argues that the question whether these exceptions were pretextual is one for the factfinder. *Id.*

Further, Mr. Williams argues that "[t]he City's amendments to its 2021 promotional rules raise[ ] suspicion as to its timing." *Id.* at 26 (cleaned up). Mr. Williams contends that the City changed the rules regarding tardiness to orientation,

where to send candidate conflict forms, where to submit PAWs, and uniform requirements. *Id.* Mr. Williams says that "[t]he timing for this rehaul is suspicious because it occurred after filed Williams' EEOC charge of discrimination in January 2021 complaining that the process was racially biased." *Id.* at 27. Mr. Williams posits that "[a] reasonable juror could infer that this was done in an effort to not have another instance of race discrimination." *Id.*

In addition, Mr. Williams argues that "[c]omments and actions from the City suggest that it took a candidate[']s race into consideration during the promotional process." *Id.* at 28. Mr. Williams cites the presence of a spreadsheet that contained "candidates['] . . . race, sex, and age." *Id.* According to Mr. Williams, HR used this spreadsheet to make sure the promotional process did not adversely impact African-Americans or women. *See id.* Mr. Williams says that the existence of the spreadsheet along with these comments lead to an inference of racial discrimination. *See id.* at 28–29.

The City replies that Mr. Williams "misstates the record evidence" regarding the Conflict Form email. Doc. 39 at 6. According to the City, it is "undisputed that . . . [Ms.] Moorer searched her emails and found no conflict form sent by [Mr. Williams] on or before July 1st." *Id.* And the City argues that its IT department confirmed that was true after searching Ms. Moorer's email inbox. *Id.* at 6–7.

18

The City says that even if Mr. Williams were correct, and "the City made an error and somehow neither Ms. Moorer or the City's IT department could find a record that Plaintiff timely emailed the conflict form, when he actually did, that should not change the analysis as to discriminatory conduct." *Id.* at 7. That investigation and its results, according to the City, "is readily sufficient to justify [the City's] decision to deduct points for timeliness, and in no way suggests discriminatory conduct on the part of the City." *Id.* at 8.

The City also contends that Mr. Williams's arguments fail to show that the City's stated reason not to promote him was pretextual. *See id.* The City asserts that any deviations from the procedures "were universally and equally applied accommodations that did not negatively impact anyone's score or ability to continue with the promotion process." *Id.* at 9. In the City's view, because "[a]ll candidates of all races were treated equally . . . there is no evidence of discrimination." *Id.*

The City provides explanations for why it allowed certain deviations but disallowed other ones. *See id.* at 10. Because "[t]he virtual orientations took place during June 2020, during the beginning of the COVID pandemic[,]" many of the candidates were unfamiliar with the videoconferencing software. *Id.* During the orientation sessions, Ms. Moorer had to assist many candidates with technology issues. *Id.* And the City contends that those accommodations had to be made after the problems occurred: "How would the City know to offer make-up sessions . . .

19

until after the candidates experienced the difficulties entering the Webex in the first place and the City had an understanding of the reasons?" *Id.* at 10–11. The City says that the technical difficulties that applicants experienced while trying to enter the virtual orientation were different in kind from Mr. Williams's "failure [to correctly] type Ms. Moorer's email address for the conflict form." *Id.* at 11. And "there was no evidence that anyone besides [Mr. Williams] had difficulty typing the email address correctly or understanding how to send the email." *Id.*

The City further contends that the 2021 changes to the promotion process were not discriminatory. According to the City, those changes began "going into the 2020 promotion process, not after." *Id.* at 12. The City argues that "[t]he 2020 promotion process was the first time the process was used and the first time HR had administered the promotion process rather than the fire department." *Id.* at 13. Thus, "[i]t is not surprising that the City made changes and improvements based on its first experience in 2020." *Id.* According to the City, "[t]he mere act of changing hiring procedures does not imply past discriminatory practice." *Id.*

The City argues that the spreadsheet containing demographic information of candidates for promotion is not evidence of discrimination. *Id.* Ms. Madajczyk "stated that the demographic information was included as a way for HR to track demographics to make sure the process was not unfair to individuals of color, or on the basis of gender or sexual orientation." *Id.* at 14. And the City contends that "[t]he

mere collection and availability of racial demographic information, without more, does not support the inference of intentional discrimination." *Id.*

Mr. Williams's opposition to summary judgment fails because it is based on speculation and misstatements, not evidence. And "inferences in favor of a plaintiff can be based only on evidence—not on speculation." *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1058 (11th Cir. 2020). Mr. Williams relies heavily on his multiple complaints to HR about his perception that African–American applicants received special treatment throughout the promotion process, *see* Doc. 38 at 22–23, and that his PAW was graded incorrectly, *see id.* at 22. Mr. Williams speculates that, because he made those complaints "weeks after the June 1, 2020 Birmingham, AL riots as it related to racial tension in the United States and the murder of George Floyd," Doc. 38 at 22 n.2, he faced discrimination when Ms. Moorer "'found' his July 1, 2020 email past the deadline on July 16, 2020," and he received a five-point penalty, *id.* at 23.

Further, Mr. Williams's speculation relies on a misstatement of the record. Although Mr. Williams asserts that Ms. Moorer later "found" his July 1, 2020 email, *id.*, that is not what she said in her deposition. Ms. Moorer said that she "did not receive [the email] on July 1st." Doc. 33-3 at 20, Dep. 72:7. According to Ms. Moorer, she never found any email from July 1st, but instead she received an email from Mr. Williams on July 16th. *See id.*, Dep 71:2–72:2.

21

And even if Mr. Williams sent the email on July 1, the court cannot infer that Mr. Williams received a five-point penalty, along with four other Caucasian applicants and three African–American applicants, because of discrimination. *See* Doc. 34-1 at 6–7. (Indeed, despite receiving the five-point penalty, three of the four other white applicants had a point total which earned them a promotion.) *See id.* at 7.

Mr. Williams also asks the court to speculate about the reason the City enforced the deadline regarding the conflict form but did not strictly enforce the timeliness and attendance requirement for orientation sessions, the timeliness requirement for turning in the PAW, and the uniform requirement. "An employer's violation of its own normal hiring procedure may be evidence of pretext." *Bass v. Bd. of Cnty. Comm'rs*, 256 F.3d 1095, 1108 (11th Cir. 2001), *overruled on other grounds by Crawford v. Carroll*, 529 F.3d 961, 971 (11th Cir. 2008). But Mr. Williams has not developed any evidence to support the inference that racial discrimination was the reason for the enforcement of one rule and the lack of enforcement of others. Mr. Williams says that a reasonable jury could conclude that the City's selective enforcement of rules was racially motivated because the City knew the racial makeup of the applicants who received leniency and those who received harsher treatment. *See* Doc. 38 at 24–25. But Mr. Williams has no evidence

22

to support the idea that the City made certain exceptions *because* it would help Black applicants or harm white applicants.

The only evidence Mr. Williams has developed is: (1) evidence that the City amended its promotion process in 2021, *see* Doc. 38 at 26, and (2) evidence that the City maintained a spreadsheet that contained the race, sex, and age of candidates for promotion along with comments made by Ms. Madajczyk about its purpose, *id.* at 28. With respect to the alleged changes to the promotion process in 2021, Mr. Williams again asks the court to speculate that those changes were made to remedy past discrimination, *see id.* at 27, but without any evidence to support his hypothesis. The City disputes when exactly the changes occurred, but even if the court credits Mr. Williams's theory that the City completely revised the process after he was not promoted, he fails to account for the City's rational explanation about the timing: "The 2020 promotion process was the first time the process was used and the first time HR had administered the promotion process rather than the fire department. It is not surprising that the City made changes and improvements based on its first experience in 2020." Doc. 39 at 13.

Likewise, there is no evidence about the spreadsheet that could support an inference of discrimination. *Ossmann v. Meredith Corp.*, 82 F.4th 1007 (11th Cir. 2023), is directly on point. In *Ossmann*, the defendant's stated reason for terminating the plaintiff was sexual harassment. *Id.* at 1011. The plaintiff alleged that his

termination was due to race, *id.*, and he produced a form that was part of the termination analysis that included his race and how his "termination would affect the demographics" of the defendant's workplace, *id.* at 1013. The HR director testified that the purpose of the form was "to ensure that the company was 'being equitable[,]'" or "to make sure that the company was not 'treating one person in that situation in that comparable group differently than others.'" *Id.*

The Eleventh Circuit held that "[n]o reasonable jury could conclude from the bare fact that this document includes data on the race of all . . . employees at the station that [the plaintiff] was fired because of his race." *Id.* at 1018. That is because the form's language did not tell the decisionmaker "what she should do with the racial data, and it does not require her to engage in racial balancing—it is completely neutral." *Id.* at 1017. Because the court had "no evidence either way," as to whether race was a factor in the termination decision, "to infer that without any other evidence [would have been] nothing but speculation." *Id.* at 1018. The "evidence [was] neither convincing nor a mosaic." *Id.* at 1020.

Just so here. The existence of the spreadsheet containing demographic data, including race, is undisputed. *See* Doc 38 at 28–29; Doc. 39 at 13–14. Mr. Williams argues that the City used the spreadsheet when considering promotions. *See* Doc. 38 at 28–29. Even so, as was the case in *Ossmann*, no reasonable jury could conclude from the mere existence of this form that Mr. Williams was not promoted because of

24

his race. *See* 82 F.4th at 1018. Like the HR director in *Ossmann*, Ms. Madajczyk said that the purpose of keeping the demographic information was to make sure the process was not unfair due to race, gender, or sexual orientation. *See* Doc. 33-2 at 25, Dep. 91:12–18. Like the plaintiff in *Ossmann*, Mr. Williams has no evidence that the City used this spreadsheet for racial balancing. *See* 82 F.4th at 1017.

Therefore, Mr. Williams's claims do not survive summary judgment under the convincing mosaic metaphor.

### 3.     Mr. Williams's Title VII Claim (Count II) Does Not Survive Summary Judgment On a Mixed-Motive Theory

"[T]he mixed-motive theory does not depend on proof of a single, 'true reason' for an adverse action." *Phillips*, 87 F.4th at 1327 (cleaned up). A plaintiff asserting a Title VII claim under a mixed-motive theory must offer "evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff and; (2) [a protected characteristic] was *a* motivating factor for the defendant's adverse employment action." *Id.* (cleaned up). At the summary-judgment stage, "the court must determine whether the plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [her protected characteristic] was a motivating factor for [an] adverse employment decision." *Quigg*, 814 F.3d at 1239 (cleaned up).

To be clear, "[m]ixed-motive and single-motive discrimination are different theories of discrimination, as opposed to distinct causes of action." *Id.* at 1235 n.4. Mr. Williams possibly referenced the mixed-motive theory of discrimination in his complaint when he alleged that "[t]he City of Birmingham's motivating factor in denying [him] a promotion" was his "race." Doc. 1 ¶ 120. But neither he nor the City discuss the mixed-motive theory of discrimination in their summary judgment briefing. *See* Docs. 32, 38, 39.

"There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995). "Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Id.* Because Mr. Williams did not rely on mixed-motive grounds on summary judgment, that argument is now abandoned, if ever it were formally raised.

Because no reasonable jury could conclude that the City did not promote Mr. Williams due to his race, the City's motion for summary judgment on Counts I & II is **GRANTED**.

### B.    Mr. Williams's Equal Protection Claim (Count III)

"Section 1983 provides a remedy against any person who, acting under color of state law, deprives another of rights protected by the Constitution." *Wyke v. Polk*

*Cnty. Sch. Bd.*, 129 F.3d 560, 568 (11th Cir. 1997) (cleaned up). Section 1983 applies to "municipalities and other local government units." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

"[L]ocal government entities may not be held liable on a respondeat superior theory." *Wyke*, 129 F.3d at 568. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694.

The City argues that Mr. Williams "is unable to establish a failure to promote in violation of his equal protection rights and that the City's deliberate conduct was the moving force behind any such alleged violation." Doc. 32 at 23. The City contends that Mr. Williams does not allege, nor does he produce any evidence, "of any policy, custom or practice of the City that violated [Mr. Williams's] rights or that the City's deliberate conduct was the moving force behind any such violation." *Id.* The City also argues that "there is no evidence that any City employee involved in making decisions relating to Plaintiff during the promotion process was responsible for establishing any policy[,] custom or practice of the City." *Id.*

Mr. Williams responds that "[g]enuine issues of material fact exist as to whether the City violated [his] rights under the Equal Protection Clause." Doc. 38 at 29 (cleaned up). According to Mr. Williams, "Human Resources was the policy

27

making authority for the City in terms of Fire Lieutenant promotions." *Id.* at 30. But Mr. Williams also states "that the Mayor of the City of Birmingham is the final policy-making authority in terms of the promotional process." *Id.* Mr. Williams says that "the Mayor adopted or ratified the decisions of a subordinate's decision not to promote Williams . . . based on his race." *Id.* at 31–32.

Mr. Williams provides no evidentiary support or legal authority for his assertion that the City's decision not to promote him violated his constitutional rights under the Equal Protection Clause. He rests on the bare assertion that "the Mayor ratified the decisions of those subordinates who worked under him who decided not to promote Williams based on his race." Doc. 38 at 32. But the court has already explained that Mr. Williams failed to produce evidence that could convince a reasonable jury that the City's decision to not promote him was based on race. *See supra* Section III.A. Because no reasonable jury could find a constitutional violation, Mr. Williams's Section 1983 claim also cannot survive summary judgment. The City's motion for summary judgment on Mr. Williams's Section 1983 claim is **GRANTED**.

### C.   Mr. Williams's Retaliation Claims (Counts IV and V)

In Counts IV and V, Mr. Williams asserts claims of retaliation under section 1981 and Title VII. Doc. 1 ¶¶ 142–52. "Retaliation claims . . . under 42 U.S.C. § 1981 . . . are analyzed under the same framework as Title VII claims." *Gogel v. Kia*

*Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc).

The retaliation provision of Title VII prohibits an employer from "discriminat[ing] against" an employee because she "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. 42 U.S.C. § 2000e–3(a). "To establish a claim of retaliation, [a plaintiff] must prove that she engaged in statutorily protected activity, that she suffered an adverse action, and that the adverse action was causally related to the protected activity." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018). To establish causation, a plaintiff must prove "that the protected activity was a but-for cause of the alleged adverse action by the employer." *Id.* (cleaned up). In other words, "a plaintiff must prove that had she not complained, she would not have been" subjected to the alleged discriminatory action. *Id.* A plaintiff may prove a retaliation claim under the *McDonell Douglas* framework or using the convincing mosaic metaphor. *See Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1337–38 (11th Cir. 2023). "[T]he mixed-motive framework does not apply to Title VII retaliation claims." *Id.* at 1338.

The City first contends that Mr. Williams's "claims fail because he cannot show sufficient evidence of causal connection between his protected activity (making complaints of alleged race discrimination in the promotion process) and being denied a promotion." Doc. 32 at 24. Although the City acknowledges that Mr.

Williams "made complaints during the promotion process that other candidates were not penalized for being late to the Webex Orientation or for not wearing specified attire," the City argues that its "application of these rules was applied equally to all candidates and, therefore, did not subject [Mr. Williams] to any kind of retaliation." *Id.* at 25. Further, the City argues that Mr. Williams "has not, and cannot, demonstrate that his work sample and/or PAW scoring was somehow the result of retaliation for making complaints of racial discrimination." *Id.* at 26.

Second, the City argues that "[t]here is no evidence that the ultimate decisionmaker had knowledge of [Mr. Williams's] complaints of discrimination." *Id.* (cleaned up). The City contends that Chief Moon made the ultimate decision on candidate promotion, and that Mr. Williams presents "no evidence that Chief Moon (or the Mayor) were aware that Plaintiff made complaints of race discrimination, or any complaints, until after Plaintiff's points for Phase I and II ranking had already been tabulated showing that he would not advance to Phase III, and so would not be promoted." *Id.* at 26–27.

Mr. Williams responds that by using circumstantial evidence, the court "can infer that [he] was retaliated against by complaining of discrimination." Doc. 38 at 32–33. Mr. Williams argues that he "was not given his 5 points for the highly disputed timely submission of his candidate conflict form." *Id.* at 33. Mr. Williams posits that the timing of the email and the related deduction is relevant because he

30

had recently complained that African–American candidates were receiving preferential treatment in the promotion process. *See id.*

Mr. Williams also states that he "received an email from Ms. Madajczyk[] about an opening for fire lieutenant promotions around six . . . months after he filed this instant lawsuit." *Id.* at 34. But when Mr. Williams contacted the Jefferson County Personnel Board to inform them about his lawsuit, "the Personnel Board responded by telling [him] that he was not on the list it provided to the City." *Id.* That fact is relevant, Mr. Williams says, because "[n]ormally, the Jefferson County Personnel Board gives the City of Birmingham a list of eligible candidates for promotion." *Id.*

Mr. Williams further argues that the fact that his rank increased from 62nd to 1st on his next attempt at promotion along with "the City's complete overhaul of its 2021 promotional guide compared to 2020 could all be considered attempts by the City to cover its tracks from the retaliation it exhibited towards [him] in 2020." *Id.* at 34–35. Also, Mr. Williams says that Chief Moon's comment after he was eventually promoted—"I'm sorry HR f[*****] you last time but I'm glad they got it right"—shows that he "knew all along what HR was doing to retaliate against [him]." *Id.* at 35.

The City replies that Mr. Williams "has not provided competent evidence that the City's determination that he did not timely submit his conflict form was based

Case 2:22-cv-00439-AMM   Document 40   Filed 08/26/24   Page 32 of 34

on . . . retaliation." Doc. 39 at 5 (cleaned up). The City reiterates that Ms. Moorer testified that she never received the conflict form email before July 16, *see id.* at 6, and that even if the court credits Mr. Williams's account that he did send the email on July 1, the City's actions were not discriminatory because "[a]ll eight candidates who did not submit the conflict form on time were given a five-point deduction," *id.* at 7. If the City should not have penalized Mr. Williams, that would have been a simple error and not the result of discriminatory conduct. *See id.* Further, the City contends that the Jefferson County Personnel Board's alleged statement that "he was not on the list of candidates eligible for promotion" is irrelevant because "[t]he Jefferson County Personnel Board is a different entity." *Id.* at 15.

Mr. Williams's retaliation claims fail because he cannot establish that the adverse action—his failure to receive a promotion—"was causally related to the protected activity." *Jefferson*, 891 F.3d at 924. Mr. Williams's evidence includes: (1) Ms. Moorer's alleged "discovery" of his (alleged) July 1 email on July 16, which occurred after he had complained about the promotion process, *see* Doc. 38 at 33[1]; (2) the statement of the Jefferson County Personnel Board that he was not on the list of candidates eligible for promotion, *see id.* at 34; and (3) Chief Moon's comment

---

[1]There is no evidence in the record that Ms. Moorer discovered an email from Mr. Williams sent on July 1.

to Mr. Williams after he was later promoted, *see id.* at 35.

Viewing all that evidence in the light most favorable to Mr. Williams, a reasonable jury could not find that the City retaliated against Mr. Williams. None of that evidence relates to race or to Mr. Williams's protected activity. Even if the City erred in assessing Mr. Williams a five-point penalty, Mr. Williams does not, and cannot, show that penalty was assessed because of his protected activity. He provides no connection explaining how his failure to be promoted was related to the statement of a different entity—the Jefferson County Personnel Board. And, even if Chief Moon said that HR wronged Mr. Williams, there is no evidence that Chief Moon connected that belief to protected activity.

Accordingly, Mr. Williams's circumstantial evidence fails to create a convincing mosaic of evidence that "strongly suggest[s]" the City failed to promote him in retaliation for his protected activity. *Poer*, 100 F.4th at 1337. Further, none of that evidence engages, let alone rebuts, the City's nondiscriminatory explanation for its decision not to promote Mr. Williams: he turned in his conflict form late and scored too low on Phases I and II to advance through the promotion process.

Mr. Williams's evidence fails to create a convincing mosaic of retaliation on the part of the City. Therefore, the City's motion for summary judgment on Counts IV and V is **GRANTED**.

33

## IV.   CONCLUSION

The court **GRANTS** the City's motion for summary judgment and **DENIES**

Mr. Willams's motion to strike. The Clerk of Court is **DIRECTED** to close the case.

**DONE** and **ORDERED** this 26th day of August, 2024.

_____
**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE